COPY
MASTER ORIGINAL
ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

x

MAURICE THOMAS
Plaintiff

Vs

ATLANTIC EXPRESS CORP, THE NEW YORK CITY BOARD OF EDUCATION and THE NATIONAL BROADCASTING COMPANY
Defendants

x

Civil Action No: 07 CIV. 1978

Judge: ROBINSON

COMPLAINT

FILED
U.S. DISTRICT COURT
2007 MAR -7 P 3:1
S.D. OF N.Y. W.P.

Nature of Action

1. This is an action by a school bus driver, plaintiff Maurice Thomas, for breach of due process rights by his employer defendant Atlantic Express for the procedure and manner in which they discharged him. Defendant The NYC Board of Education, was the sole client of the bussing company defendant Atlantic and so although the bussing was privatized the driver's employment is akin to public service and it is argued that he should be cloaked with the corresponding civil rights and employee protections as well as those of the specific State and City laws.

2. A Due process claim is also brought against defendant the NYC Board of Education for their actions in participating in plaintiff's discharge review process and hence their direct or implicit ratification of the acts of defendant Atlantic.

3. A breach of contract claim is made against defendants Atlantic with whom plaintiff had a union employment contract and defendant the NYC Board of Ed for their implied contract with plaintiff.

4. A final claim is made against a TV broadcasting company, defendant WNBC for their tortious interference with the employment contract between plaintiff and defendant Atlantic through their broadcast of film taken surreptitiously of plaintiff allegedly operating his bus in an unsafe manner that led to his discharge.

Jurisdiction

5. Jurisdiction is by subject matter where the action for Federal constitutional claims ( 42 U.S.C. Sec 1983 and/or *Bivens* claims ) as well as by the Federal labor law that states:

> "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."

Venue

6. Venue is based on the County of residence of plaintiff as well as principal place of business of defendant's Atlantic and WNBC.

The Parties

7. Maurice Thomas, plaintiff, is a natural person who is and was at all times relevant herein a resident of the county of the Bronx, City of New York.

8. Defendant Atlantic Express Corp ( hereinafter referred to as " Atlantic" ) is and at all times hereinafter mentioned was, a corporation organized and existing under and by virtue of the laws of the State of New York and maintaining its principal place of business at 101 Lincoln Ave, Bronx N Y. C. 10454.

9. Defendant National Broadcasting Company ( hereinafter referred to as " NBC" ) is and at all times hereinaft mentioned was, a corporation org ized and existing under and by virtue of the laws of the State of New York and maintaining its principal place of business at 30 Rockefeller Plaza New York N Y. C.

10. Defendant The New York City Board Of Education ( hereinafter referred to as " The NYC Board of Ed" ) is and was at all times mentioned hereinafter a municipal agency of the City of New York with its headquarters located at 2 Metrotech Center in the County of Brooklyn, N Y C.

11. Plaintiff is informed and believes and based thereon alleges that each defendant was in some manner intentionally and/ or negligently and legally responsible for the events and happenings alleged in this Complaint and for plaintiff's injuries and damages.

And For A First Cause of Action Against Defendants Atlantic Express and NYC Board of Education

12. Plaintiff Thomas was employed by defendant Atlantic Express to drive a school bus for six years prior to the subject termination.

13. Based on information and belief the bus was leased, and based on personal knowledge was used exclusively, by defendant's client the NYC Board of Ed, i.e. to transport the children to and from NYC Board of Ed's schools.

14. Plaintiff's employment was governed by a union contract; the Amalgamated Transit Union Local 1181-1061.

15. On October 18, 2004 NBC Channel 4 did a special report on the 6:00 pm news about school bus safety. Cameras trailed several school buses, one of which was identified by its number to have been driven by plaintiff. The NBC reporter presented statements

15.   On October 18, 2004 NBC Channel 4 did a special report on the 6:00 pm news about school bus safety. Cameras trailed several school buses, one of which was identified by its number to have been driven by plaintiff. The NBC reporter presented statements that plaintiff had gone through a red light ( no children where on the bus, the bus was returning from a drop off). Defendant Atlantic was identified in the program.

16.   When the Board of Ed became informed of this alleged infraction it supplied defendant Atlantic with a copy of the video tapes and defendant's representatives also concluded that plaintiff had passed through a red light.

17.   Defendant Atlantic immediately hired two private investigators to conduct video surveillance of plaintiff's bus on October 19, 2004, the day following the airing of the NBC report on TV.

18.   The private investigators prepared a report the same day that alleged that plaintiff had passed thorough three red lights that day ( again with no children on the bus, i.e. on a return route from a drop off). The report also alleges that plaintiff failed to place a " No Sleeping Children" sign in the rear of the bus' window as required by the Borad of Ed, failed to have his marker lights on and failed to use his signals in one instance when changing lanes.

19.   Plaintiff did not see the special report on TV and did not know anything about these goings on until on October 21, 2004 defendant company's General Manager Charles Butera called plaintiff into his office where he appeared accompanied by the union shop steward " Tommy" and was fired on the spot without any prior warning, notice, or opportunity to be heard at an arbitration hearing as required by the contract, but instead was told that the basis for his discharge was for unsafe driving and given a

cursory explanation of the NBC tapes and the private investigator's findings. Plaintiff was not given the opportunity to view any of the tapes. No termination letter nor anything in writing was given to plaintiff. No severance pay was given to plaintiff.

20. The General Manager's actions in discharging plaintiff were wholly within his responsibilities and he acted wholly within his capacity as an employee of defendant Atlantic who ratified the acts by doing nothing despite their constructive knowledge that the union contract required arbitration.

21. That afternoon the Union Shop Steward called plaintiff at this home and told him that a panel of Board of Ed personnel was going to conduct a special hearing on the matter the next day before at their Queens headquarters and he was to appear.

22. Approximately five Board of Ed personnel were present for the hearing, interviewed plaintiff and asked him to write out a brief statement of the facts which he did and which he submitted to them. At the close of the hearing the panel told plaintiff that no penalty or punitive action was warranted and an explicit directive was given to plaintiff to "return to work". (apparently no documentation of the hearing was made or given to plaintiff Thomas).

23. On December 2, 2004 the Union's executive board urged an arbitration hearing onto defendant Atlantic wherein there would be a decision as to if there was " just cause" for discharge as required by the contract.

24. The arbitration hearing was scheduled for February 9, 2005 four months after the incidents in direct contravention of the contract's explicit requirement that the hearing be held within five days of the incident.

25. The arbitration hearing was conducted wherein, plaintiff was represented by a union assigned attorney, the private investigators testified, and defendant's representative the General Manager Charles Butera testified and was represented by an attorney.

26. Plaintiff had never, up until this time of the actual hearing, been given an opportunity to examine the video tapes or the report of the private investigators, nor was he informed as to who would be testifying at the hearing and what evidence would be used.

27. Plaintiff had asked the union if he could meet with the assigned attorney the day before to prepare, however the union said that a meeting just before the hearing was sufficient. He hardly had anytime to review the matter with the assigned attorney.

28. As a result of the delay in scheduling the arbitration hearing, i.e. four months after the incidents, plaintiff had no present recollection of the events and instead had to rely on his interpretation of the film images for his defense.

29. The arbitrator concluded that defendant had "just cause" to discharge plaintiff.

30. The arbitrator states in his decision:

> "The Company's [ defendant Atlantic ] conclusion that Grievant was an unsafe driver was supported by very convincing evidence and, accordingly given the fact that such conduct was egregious, the Company had just cause to summarily dismiss him to protect N Y C's school children and the public, if not also the Company's vehicles and reputation. *Indeed the Employer would be remiss and* opening itself to significant liability were it to retain a Driver who it learned was so grossly negligent".

31. Prior to the arbitration plaintiff was not apprised that there were private investigators who would testify. He was never shown the video tapes or given a copy to review before or after the hearing, nor was he appraised that there were video tapes that would be used as evidence against him. In fact at no time were the tapes given to plaintiff to view or a viewing conducted for his benefit. His first viewing of them was during the arbitration hearing.

32. Plaintiff was denied due process rights of evidentiary disclosure and appraisal of the proceedings of the hearing when considered in relation to the risk level of the hearing's potential outcome, i.e. termination.

33. Plaintiff alleged in the arbitration hearing that he never when through any red lights but got caught in an intersection when the light changed due to gridlock on one occasion and had the rear of the bus caught in the intersection when the light turned red due to the delay of manouvering the bus through a right hand turn into the intersecting street due to the long length of the bus. However plaintiff was denied the right to have an opportunity to be heard while his memory would have been fresh of the events, he was forced to defend the representations of the alleged actions from the *videos tapes only which again he had not seen previously or had an opportunity to* examine.

34. The decision of the arbitration hearing finalized plaintiff discharge; no intervention nor comment in any way was made by the NYC Board of Ed despite their contrary findings in the earlier hearing of their panel and their explicit directive to plaintiff to " return to work".

35. No actions or opportunity was given to plaintiff to be rehabilitated and remedy the alleged violations of the employee –employer employment requirements.

36. Plaintiff is a 50 year old Jehovah witness who had to take his daughter out of college when he lost his job and defaulted on credit cards, his mortgage, and other financial responsibilities he had causing him and his wife to have to get extended payout agreements and his wife to pay significant penalty fees from the modest earning she makes in her secretarial job.

37. Plaintiff suffered from heart problems as a result of the anxiety and depression caused by this improper discharge and loss of income and had to be taken to the hospital for the same condition.

38. Plaintiff was deprived defendants Atlantic and the NYC Board of Ed of his right to notice and an opportunity to be heard and was thrown before differing bodies of authority without clarity as to the governance and final authority of each dispute resolution mechanism, nor was he given a fair hearing within a reasonable time from the alleged events so as to allow him to be heard based on actual fresh memory of the events alleged.

39. Plaintiff was deprived by defendants Atlantic and the NYC Board of Ed, of his right to employment equivalent to a public employee as the entity defendant Atlantic exists based on information and belief for the NYC Board of Ed not to be in the business of providing bussing services not to avoid the rights and protections of public/city employees and therefore defendant Atlantic can be viewed as having the responsibility to uphold the civil rights statutes as they apply to government, public, state of city employees.

40. By reason of the foregoing defendants Atlantic and the NYC Board of Ed are jointly and severally liable to plaintiff for compensatory damages of lost income from day of discharge through date of trial, minus any mitigating income, and tort claims for the emotional distress, pain and suffering as well as special damages of for fines penalties and costs incurred due to late payment of bills, premiums for restructured loans or extended payout plans, etc directly due to his loss of employment income such as on his mortgage, credit card payments, school tuition for his daughter and the like.

41. Plaintiff was earning $ 900 a week when terminated plus benefits estimated at 35% of income or $ 315 per week, total $ 1,215 per week and was out of work for one year; as of February 2005 plaintiff has found other employment paying $ 600 per week with benefits of only 20% for a total of $ 720. Therefore compensatory damages equal $ 1,215 multiplied by 52 weeks equal to $ 63,180 plus $ 1,215 minus $ 720 for the mitigated income, multiplied by 16 weeks or four months, March through June , current, equal to $ 7,920 with this same number of $ 500 per week forward until the time of trial and reinstatement. Total to date equal to SEVENTY ONE THOUSAND ONE HUNDRED DOLLARS ( $ 71,100 ).

42. Tort damages of TWO HUNDRED FIFTY THOUSAND DOLLARS ( $ 250,000 ).

43. And special damages of FORTY THOUSAND DOLLARS ( $ 40,000 ).

44 Grand Total to date equal to THREE HUNDRED SIXTY ONE THOUSAND ONE HUNDRED DOLLARS ( $ 361,100 ).

45 Further plaintiff is entitled to be reinstated in the position.

As And For A Second Cause of Action Against Defendants Atlantic and NYC Board of Ed

45. Paragraphs 1 though 45 are repeated and reiterated here with the same force and effect as if set forth.

46. Based on information and belief no other bus driver employee of defendant Atlantic has been discharged for any violations relating to their job performance but may have been suspended, other than possibly for criminal acts.

47. The regulations of defendant company Atlantic as to penalties for failure to display the " No children asleep" sign at the rear of the bus were set forth in a flyer distributed to the employees which stated that three incidents must occur in order to result in termination.

48. Plaintiff testified that there was a new alternate system to address the purpose of the No Sleeping Children sign in the bus consisting of lights that could only be switched from the rear of the bus forcing the driver to make the required walkdown of the bus to the rear to assure that there were no sleeping children and that he was told by another employee that the new system was the procedure to use on that bus inplace of the sign procedure.

49. Plaintiff alleges that the reason his marker lights may have not been on at all times was if he had allowed a child to play with the switch as a friendly gesture, however his memory was not fresh due to the four month time lapse between the initial discharge meeting and the arbitration hearing.

50. Plaintiff had never received any negative job performance reviews or comments nor does he have any traffic violations whatsoever both in his personal and work life.

51. The employment contract of the union has a section on seniority implying that protection and different treatment was to be given to the more senior employees,i.e laid- off employees are to be notified of re-hiring in their order of seniority, changes in routes for the more senior bus drivers are subject to approval and review by the union unless required by Board of Ed factors, a list of "casual" and " regular" employees shall be maintained for preferential treatment to the regular employees, and that the employer shall abide by the rules of seniority promulgated by the union.

52. Defendant Atlantic intended to discharge plaintiff in retaliation for their bad publicity from the NBC special report regardless of the merit of the evidence as can be seen from their precipitous action and their disregard of their obligations to schedule and then long delay in scheduling an arbitration hearing on the matter indirect contravention of the explicit requirements of the contract calling for the arbitration hearing to be held within five days of the incident.

53. By Reason of the foregoing plaintiff claims, against defendant Atlantic, all contract damages of lost wages past and going forward to the date of trial minus his lessor salary earned in his current bus driver job started in February 2006 equal to SEVENTY ONE THOUSAND ONE HUNDRED DOLLARS ( $ 71,100 ) and consequential damages of FORTY THOUSAND DOLLARS ( $ 40,000 ) for fines penalties and costs incurred due to the loss of his income earning ability as to mortgage payments, credit card payments, school tuition for his daughter and the like plus incidental costs to be determined by the court, total ONE HUNDRED ELEVEN THOUSAND ONE HUNDRED DOLLARS ( $ 111,100 ).

54. Further plaintiff is entitled to be reinstated in the position.

55. A landmark Court of Appeals case, The Matter of New York City Transit Authority v Transport Workers Union of America, Local 100 AFL-CVIO ( 99 NY2d 1, 780 NE2d 490, 750 NYS2d 805 [2002]), let stand an arbitration decision to merely suspend a transit subway driver without pay for 6 months due to his unsafe operation of the train causing actual injury to persons rather than recognize the Transit Agency's demand for the court to override the arbitration decision and terminate the employee.

56. Defendant the NYC Board of Ed is also liable jointly and severally for this claim based on the breach of an implied contract and their ratification of this acts by doing nothing despite their constructive knowledge that defendant Atlantic had acted in breach of the contract.

As And For A Third Cause of Action Against Defendant NBC

57. Paragraphs 1 though 56 are repeated and reiterated here with the same force and effect as if set forth.

58. Defendant NBC, a third party wholly outside the employment contract and reciprocal obligations and duties between plaintiff with his employer and the Board of Ed, did intervene on its own accord and without any authority into these contract relations of and did cause injury to plaintiff.

59. By reason of the foregoing defendant NBC is jointly and severally liable to plaintiff for contract damages equal to ONE HUNDRED ELEVEN THOUSAND ONE HUNDRED DOLLARS ( $ 111,100 ).

WHEREFORE it is requested of this Court to grant plaintiff the relief requested equal to:

A) a judgement against defendants Atlantic and NYC Board of Ed jointly and severally in the amount of THREE HUNDRED SIXTY ONE THOUSAND ONE HUNDRED DOLLARS ( $ 361,100 ) as well as order plaintiff reinstated, or

B) a judgement against all defendants Atlantic, the NYC Board of Ed and WNBC jointly and severally in the amount of ONE HUNDRED ELEVEN THOUSAND ONE HUNDRED DOLLARS ( $ 111,100 ) plus incidental costs to be determined later as well as order plaintiff reinstated, and/or

C) order such other relief as the court deems just and proper.

Dated: Bronx, New York City

     September 26, 2006

                                   Robert Tavon, Esq

                               5424 Arlington Ave , # H63

                               Bronx, New York 10471

                               ( 914 ) 309 – 9598

fax   ( 718 ) 796 - 0723

## VERIFICATION

Maurice Thomas, being duly sworn, states that he is the deponent in this matter, i.e. plaintiff and has read the foregoing complaint against defendants Atlantic Express Inc and The New York City Board of Education and that the allegations are true to his own personal knowledge, except as to matters therein stated to be alleged on information and belief and as to these matters he believes them to be true.

The source of allegations based on information and belief is documents and correspondence of defendants and conversations with the same defendants representsatives.

Maurice Thomas

NOTARY:





-------------------------------------------X

In the Matter of the Arbitration

Between

**ATU Local 1181-1061**

-and-

**Atlantic Express**

-------------------------------------------X

**OPINION AND AWARD OF ARBITRATOR**

(Maurice Thomas)

Before: **Elliott D. Shriftman, Esq., Arbitrator**

Appearances:

For the Union: **Haydon Straci & Cooper**
**by: Thomas Rubertone, Jr., Esq.**

For the Employer: **Mintz & Gold, LLP**
**by: Jeffrey D. Pollack, Esq.**

* * * * * * * * * *

The undersigned, pursuant to the selection of the parties, was duly designated to serve as arbitrator of the dispute described below. A hearing was held at the offices of Mintz & Gold, LLP, 470 Park Avenue South, New York City on February 9, 2005. The parties appeared; were represented, as noted; and, were given a full opportunity to present evidence and make arguments.

**SUBMISSION**

Did the Employer have just cause to discharge Maurice Thomas; and, if not, what shall be the remedy?

**BACKGROUND**

ATU Local 1181-1061 ("Union") and Atlantic Express ("Company" or "Employer") are parties to a collective bargaining agreement which is still in effect[1] and which specifies that employees may not be discharged without just cause. Maurice Thomas ("Thomas" or "Grievant") had been employed by the Company as a Bus Driver for approximately six years when he was discharged, on October 21, 2004, allegedly for unsafe driving. On October 18, 2004, NBC Channel 4 did a special report on the 6:00 p.m. news about school bus safety. Cameras trailed several school buses, one of which was driven by Thomas and both the NBC reporter and Company officials who viewed the piece concluded that Grievant had gone through a red light. When the New York City Department of Education brought this fact to the Company's attention and furnished it with a copy of the NBC video, the Employer engaged two Field Supervisors, Mike Fedele ("Fedele") and Brasby Evans ("Evans"), to conduct a video surveillance of Thomas as he drove a school bus on his route on October 19, 2004, the day after NBC aired the special report. As noted on a Company document entitled, "Bronx Fuel Report", Thomas, in fact, drove a Company school bus with New York State license plate number 507128 on October 19, 2004.[2] Fedele and Evans prepared a joint

---

1 The collective bargaining agreement was deemed admitted into the record as Joint Exhibit 1.
2 This report was received into the record as Employer Exhibit 3.

report, dated October 19, 2004, concerning their observations.[3] Evans testified with the aid of the subject video surveillance and the NBC video. The incident report and his testimony assert that Thomas drove through three (3) red traffic lights on Madison Avenue at the intersections, respectively, of 89th Street, 119th Street and 120th Street. The report also chronicles the fact that from the time surveillance was conducted, Grievant had failed to have his marker lights on and did not place a "No Sleeping Children" sign in the rear window of the vehicle, as was required by the Department of Education,. Evans testified that Grievant also failed to use his directional signal when he changed lanes from right to left.

Prior to working for the Company, Evans was in law enforcement for twenty years. He stated that he has typically done safety compliance surveillance one or two times per week. Frequently, and as in this case, in performing a surveillance, Field Supervisors use a hand-held video camera.

It should be noted here that both the Employer's surveillance video of October 19, 2004 and the NBC video were viewed by the Arbitrator at the hearing. He has since viewed both videos several times.

Evans stated that Thomas may have actually gone through a red light on a fourth occasion, however, during the course of viewing the video, he explained why he had given the benefit of the doubt to Thomas on that occasion. Fedele, who was also in law enforcement prior to commencing employment with the Company, testified that the Incident Report was accurate and that he agreed with Evans' testimony in full.

The Company's third witness, Charles Butera ("Butera"), has been its General Manager for

---

[3] The report was received into the record as Employer Exhibit 1.

eight years. He explained why, after reviewing both surveillance tapes, he had reached the conclusion that Thomas had been derelict with respect to posting the no sleeping child sign and had violated safety procedures and traffic laws by going through red lights and failing to signal when changing lanes. Butera had made the decision to terminate Grievant based on these serious safety violations.

On cross-examination, Butera was asked to view the videotapes and to explain how he had reached his conclusions about Thomas' driving on October 18 and 19, 2004. While there was some debate with respect to what was fact or simply conclusion, in the end, Butera demonstrated the conduct which he believed supported his conclusion.

Although as he viewed the October 19, 2004 video during his testimony, Thomas initially would not affirm that the bus in focus was the one that he was driving, when the video was paused at various points, he and the Union stipulated that the vehicle was, in fact, the one that he drove on both October 18 and 19, 2004. In viewing the NBC tape, Grievant explained that the light had turned red while he was already in the intersection. Thomas testified that he had never received a ticket for going through a red light while driving a bus. As to the failure to have marker lights on, Thomas averred that he must have taken the lights off by mistake. With respect to the sign about no children sleeping, Grievant alleged that a co-worker had told him that the bus had a fail-safe system which did not require him to actually go to the back of the bus to put up a sign. A buzzer would signal in the event the sign was improperly turned off. Thomas believed that he did not go through a red light even once on either October 18 or 19, 2004.

**DISCUSSION**

It is beyond cavil that all drivers must obey traffic laws and make every effort to drive safely. It is equally undeniable that bus companies and their drivers have an even greater duty to insure the safety of their passengers and the public at large. It is patent that some Bus Drivers have failed to appreciate this responsibility, as the NBC report reveals. Even if one were to believe that NBC would risk its reputation by deliberately falsifying or exaggerating reports of unsafe driving, and that is not a conclusion that is supported by any evidence or the Arbitrator's own experience, the NBC video shows that Thomas went through a red light as he made a right turn into the intersection and it was as convincing as a smoking gun. Even ignoring the NBC surveillance, the Company's own surveillance video leaves no doubt in the Arbitrator's mind that Thomas went through at least two red lights and likely a third and had also failed to properly signal when changing lanes. The Company's conclusion that Grievant was an unsafe driver was supported by very convincing evidence and, accordingly, given the fact that such conduct was egregious, the Company had just cause to summarily dismiss him to protect New York City's school children and the public, if not also the Company's vehicles and reputation. Indeed, the Employer would be remiss and opening itself to significant liability were it to retain a Driver who, it learned, was so grossly negligent.

**AWARD**

After consideration of the entire record and for the reasons discussed fully in the opinion above, I find and award as follows:

The Employer had just cause to discharge Maurice Thomas.

It is so ordered.

Elliott D. Shrifiman

Dated: February 18, 2005

State of New York)
ss.:
County of Suffolk)

I, Elliott D. Shrifiman, do hereby affirm upon my Oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.

Elliott D. Shrifiman



Amalgamated Transit Union - A.F.L., C.I.O.
Local 1181 - 1061

101-49 WOODHAVEN BOULEVARD, OZONE PARK, N. Y. 11416 845-5600

**VIA REGISTERED RETURN RECEIPT**

December 2, 2004

Mr. Maurice Thomas
3971 Monticello Avenue
Bronx, NY 10466

Dear Mr. Thomas:

As a result of our Executive Board's decision to go forward with an arbitration on your behalf, please be advised that **your arbitration has been scheduled for Wednesday, February 9th, 2005 at 1:30PM,** at the Law Offices of Mintz & Gold, LLP, located at 444 Park Avenue South, New York City, New York. Please make note of this date.

Also, please be advised that our attorney, Bruce Cooper, would like to interview you **prior** to your arbitration, in order to prepare your case. Therefore, **we have scheduled an appointment for 1:00PM to meet with Mr. Cooper on that same date, Wednesday, February 9th, 2005 at the same address.**

Should you have any questions, feel free to contact the undersigned.

Sincerely,

Michael Lucivero

MICHAEL LUCIVERO
Chairperson of the
Appeals Committee

ML:la

cc: T. Jemmott



# INDEX

| Section | Subject | Page |
|---|---|---|
| I | Union Recognition | 1 |
| II | Union Security and Check-Off | 2 |
| III | No Strike | 5 |
| IV | Grievances and Impartial Arbitrator | 6 |
| V | Seniority and Tenure | 7 |
| VI | Layoffs, Recall and Transfers | 9 |
| VII | New and Successor Employers | 11 |
| VIII | No Subcontracting | 12 |
| IX | Military Service | 12 |
| X | Leaves of Absence | 12 |
| XI | Welfare Fund | 13 |
| XII | Sick Leave | 22 |
| XIII | Worker's Compensation | 22 |
| XIV | Pension Benefits | 22 |
| XV | Christmas and Easter Adjustment | 29 |
| XVI | Rates of Pay | 30 |
| XVII | Vacation for Shop Employees | 31 |
| XVIII | Wage Accruals | 32 |
| XIX | Jury Duty and Bereavement Allowance | 37 |
| XX | Hours of Work — Drivers | 37 |
| XXI | Shape Drivers and Matron Attendant Escorts | 39 |
| XXII | Driver's Responsibilities | 40 |
| XXIII | Uniforms — Drivers and Matron Attendant Escorts | 41 |
| XXIV | Holidays | 41 |
| XXV | Operation of Buses | 44 |
| XXVI | Picking of Runs | 44 |
| XXVII | Hours of Work — Shop Employees | 46 |
| XXVIII | Pick of Shifts — Shop Employees | 47 |
| XXIX | Promotions | 47 |

## INDEX

| Section | Subject | Page |
|---|---|---|
| XXX | Coveralls | 48 |
| XXXI | Shift Coverage | 48 |
| XXXII | Tools | 48 |
| XXXIII | Pay Claims | 49 |
| XXXIV | Appearance in Court | 50 |
| XXXV | Guarantee of Employment | 50 |
| XXXVI | Private and Summer Work | 51 |
| XXXVII | Tenure | 51 |
| XXXVIII | Rights and Privileges | 52 |
| XXXIX | Shop Steward/Representative | 52 |
| XL | Bulletin Board | 53 |
| XLI | Union Contribution to Welfare and Pension Funds | 53 |
| XLII | Rate of Pay for School Specials | 53 |
| XLIII | Safety Awards | 54 |
| XLIV | Escorts Subcontractor | 55 |
| XLV | Work Rules | 55 |
| XLVI | Drivers with Suspended Licenses | 55 |
| XLVII | 401-K Plan | 56 |
| XLVIII | Job Security and Withdrawal Liability Exemption | 56 |
| XLIX | No Conflict | 57 |
| L | Term of Contract | 58 |

## AGREEMENT

This Agreement is made and entered into effective as of July 1, 2002 by and between ____________ its successors, lessees and assigns (hereinafter referred to as the **"Employer"**) and **Local 1181-1061 AMALGAMATED TRANSIT UNION AFL-CIO** (hereinafter referred to as the **"Union"**)

## WITNESSETH:

**WHEREAS**, it is the desire of the parties to promote harmony between the Employer and its employees and to eliminate industrial disputes by fixing the rates of pay, wages, hours, and other conditions of the employment of the employees of the Employer as hereinafter set forth:

**NOW, THEREFORE**, in consideration of the mutual promises herein contained, the parties hereto do agree as follows:

## SECTION I
## Union Recognition

The Employer recognizes the Union as exclusive representative of all its drivers, shop employees and matron-attendant escorts excluding supervisory and clerical employees for the purpose of collective bargaining in respect to rates of pay, wages, hours of employment and other conditions of employment and agrees to deal with it as hereinafter provided.

## SECTION II
## Union Security and Check-Off

(a) The Employer agrees that all employees covered by this Agreement must be members in good standing of the Union and shall, as a condition of continued employment, be required to become members of the Union on or after the 30th day of employment or the effective date of this Agreement, whichever is later. All employees who are members of the Union at the time of execution of this Agreement or who become members of the Union at any time subsequent thereto shall remain members of the Union during the term of this Agreement. The Union agrees that all such employees will be accepted into membership on the same terms and conditions generally applicable to other members and, further, that the Employer will not be requested to discharge an employee for reasons other than such employee's failure to tender the periodic dues and initiation fees uniformly required as a condition of acquiring or retaining membership in the Union.

The Employer may hire new employees only upon condition that all employees of the Employer on furlough are first offered employment in accordance with their seniority rights. Thereafter, such new employees shall be those employees on the Master Seniority List as of June 30, 2002 (or such later date as the N.Y.C. Department of Education may approve during this contract period) who are still unemployed, or whose work has been acquired by the Employer. These employees shall follow the acquired work to the acquiring Employer. Thereafter, additional new employees may be hired by the Employer for a

probationary period of thirty (30) days, to be computed from the first day of employment. At the expiration of this probationary period, the employee, if satisfactory to the Employer, may be retained as an employee. The 30-day probationary period shall not apply to anyone on the Master Seniority List.

(b) All employees above the shape factor (104% for drivers and 106% for escorts) shall be deemed casuals. Casuals shall be subject to the Union security clause, but shall not receive any benefits under this Agreement except wages. Any casual who works 1,000 hours or more per school calendar year (July 1 - June 30) shall be covered by the pension provision of the Agreement. Pension Contributions for such employees shall not be due unless and until the employee works the 1,000th hour, after which the Employer will make contributions in accordance with Section XIV for all hours worked thereafter (to a maximum of 40 weeks) during the school calendar year.

(c) The definition of a "new hire" is an employee hired effective on or after the first day of each school year during the term of this Agreement.

(d) The Employer shall maintain two separate seniority lists; one for regular and shape employees and another for casuals. Casual work shall be assigned on the basis of the employee's seniority on the casual list, regardless of their hours worked or time in the Employer's employ, until such time as a shape position becomes available. Shape positions shall be offered on the basis of the employee's seniority on the casual list, provided that, if an employee passes up a shape

position, that employee shall be deemed to have resigned; and his/her name shall be removed from the Employer's casual seniority list.

(e) Tenure, for all purposes of this Agreement, shall commence when a casual employee becomes a shape employee; provided, however, that if the employee has been employed as a casual for three (3) months or more there will be no waiting period for health insurance or pension contributions.

A person on the Master Seniority List who has been laid off and is available for work shall have preference over casuals for the first available position.

(f) The Employer agrees to discharge, upon receiving seven (7) days' written notice, signed by the Secretary-Treasurer of the Union, any employee with respect to whom such notice may state that such employee is not a member in good standing of the Union for the reasons set forth in paragraph (a) above.

(g) The Employer agrees to deduct weekly or monthly from the wages of each employee who is a member of the Union such initiation fees and dues as shall be required by the Union and authorized in writing by the employee in the form, a copy of which is annexed to this Agreement and made a part hereof. The Employer agrees to transmit such sums collected by the Employer to the Union no later than seven (7) days after the period in which such sums are collected. The Employer shall furnish the Secretary-Treasurer of the Union with a record of those from whom deductions have been made and the amount of such deductions at

the time of transmitting such sums as have bee. collected.

(h) The Employer shall notify the Union of all new employees covered by this Agreement within seven (7) days after hire, giving name, address, Social Security Number and date of hire. A list of casual employees shall be furnished to the Union monthly and shall state the hours worked by each casual employee under this provision.

## SECTION III
## No Strike

The terms and conditions of this Agreement shall not be varied by arbitration and during the term of this Agreement the Union will not declare a strike or cause disruption of the service, nor will the Employer lock out any of its employees, except as provided under this Agreement.

Should the Employer fail to make welfare or pension contributions or pay wages, this Section shall be deemed waived provided that the Union or Fund gives to the Employer ten (10) business days' notice on welfare and pension (but not on wages) to cure the delinquency.

Notwithstanding the general "No Strike"' provision, the Union has the right to strike (without any prior notice) if the Employer fails to pay wages.

## SECTION IV
## Grievances and Impartial Arbitrator

The Employer agrees to meet with the duly accredited officers and committees of the Union to negotiate all questions in connection with this Agreement arising between them. There shall be no suspension or discharge of any employee without a hearing which shall be held within five (5) days after the incident occurs except in the case of drunkenness, drug abuse or stealing in which case such employee may be suspended pending a hearing. After such hearing, and establishment of "just cause", the employee may be discharged. Should any difference arise between them which cannot be mutually adjusted, it shall be submitted for decision at the request of either party to the Impartial Arbitrators Theodore W. Kheel, Richard Adelman, and/or Elliott Shriftman, to be utilized on a rotating basis. If Theodore W. Kheel, Richard Adelman, and/or Elliott Shriftman cease to serve as Impartial Arbitrators at any time during the life of this Agreement, then the parties shall attempt mutually to agree on a new Impartial Arbitrator. In the event they are unable to agree, then any difference or grievance arising between them which they are unable mutually to adjust shall be submitted for decision to a panel arbitrator selected in accordance with the rules and regulations of the New York State Employment Relations Board.

The decision of the Arbitrator shall be final and binding on both parties.

The expense of the Impartial Arbitrator shall be borne equally by the parties.

## SECTION V
## Seniority and Tenure

(a) The Employer agrees to abide by such rules of seniority among its employees as are adopted by the Union. Rules of Seniority must be definite and the Employer shall be advised of same and all changes with respect to same within a reasonable time after the enactment or change in said rules. It is understood that changing conditions and orders of the N.Y.C. Department of Education may make necessary changes in the runs after the commencement of the school year. The Employer agrees to notify the Union of any necessary change or changes to be made within forty-eight (48) hours of receipt of notice from the N.Y.C. Department of Education. The Union reserves the right to object to the method of carrying out such change or changes within ten (10) days after notification thereof and in the event an agreement cannot be reached, the change or changes shall, at the request of either party, be submitted to the Impartial Arbitrator for a final and binding decision. Pending such final determination, the members of the Union shall operate the disputed run or runs. During the school year, no transfer by the Employer of an employee from one terminal to another shall be made without the consent of the Union.

(b) The Employer shall maintain two (2) separate seniority lists; one for regular and shape employees and another for casuals. Casual work shall be assigned on the basis of the employee's seniority on the casual list, regardless of their hours worked or time in the Employer's employ, until such time as a shape position

becomes available. Shape positions shall be offered on the basis of the employee's seniority on the casual list; provided that if an employee passes up a shape position, that employee shall be deemed to have resigned, and his or her name shall be removed from the Employer's casual seniority list.

Tenure, for all purposes of this Agreement, shall commence when a casual employee becomes a shape employee; provided, however, that if the employee has been employed as a casual for three months or more, there will be no waiting period for welfare or pension contributions.

(c) For all purposes under this Agreement, in calculating tenure and/or length of service, an employee's period of continuous employment with the Employer shall be combined with his/her employment in any other company in the school bus industry under contract with the N.Y.C. Department of Education and the employee was doing N.Y.C. Department of Education work and as a result of loss of bid or by any other means was transferred and followed the work as if all such employment had been with the Employer. References to new employees in the Agreement shall mean employees hired on or after the first day of each school year or those who move from employer to employer on their own and have not followed the work, which constitutes a break in service.

(d) If employees follow the work from one company to one company, the employees move in the original company's seniority order.

If employees follow the work from more than a company to one company, the employees following the work to that company shall be dovetailed by tenure date as described in paragraph (b) of this section, provided such employees have not had a "break in service" as described in Section V paragraph (c) in which case their tenure dates may have changed.

If employees follow the work from one company or more than one company to more than one company, the employees following the work to those companies shall be dovetailed by tenure date as described in paragraph (b) of this section, (provided such employees have not had a break in service as described in Section V paragraph (c), in which case their tenure may have changed) and will pick new companies in tenure order.

(e) As used herein, the term "new employees", shall mean those employees who were not employed by an Employer under this Agreement (or a predecessor or successor agreement).

## SECTION VI
## Layoffs, Recalls and Transfers

(a) All layoffs and recalls to work during the school year shall be governed by city-wide seniority as decided by the rules of the Union.

(b) Employees laid off are to have preference over all outsiders in filling any existing vacancies for the same positions, provided they are in good standing with the Union and the Employer.

(c) In the event that the Employer increases its working force, employees laid off are to be notified in writing by registered mail of available positions in accordance with their seniority as follows: the oldest employee in point of service is to be notified first, the employee second longest seniority second, and so on through the list; the employees so notified to report to work shall be given five (5) days after the date of such notice in which to report. A copy of such notification shall also be sent to the office of the Union. The operation of this Section shall not prevent the immediate increases in forces by the hiring of temporary employees until an employee with proper seniority reports in accordance with this paragraph.

(d) Upon failure of an employee so to report within five (5) days after the Employer has mailed notice to the last address given to the Employer, the work shall be assigned to the first employee who upon like notification reports for duty in accordance with seniority, and any employee failing to report within the required time shall forfeit all seniority rights.

(e) Furloughed employees shall have their seniority rights preserved for the duration of this Agreement.

(f) Employees who are furloughed for summer vacations due to school closing shall be called back at the re-opening of the school term, in accordance with seniority, providing that they are in good standing with the Union.

(g) In connection with summer furloughs, as result of school closings, the parties agree that an employee

shall have the right to waive his right to reta. employment during such temporary lay-off for lack of work, and the Employer has consented thereto, such work to be performed by the next person in lower seniority who has not elected to waive his/her right to employment. However, in the event an insufficient number of employees have agreed to cover the remaining work not affected by the layoff, then such employees shall be required to perform the work and not be permitted to waive the right of employment in order to cover the runs that must be performed. This shall be done in inverse order of seniority.

## SECTION VII
## New and Successor Employers

Each new or successor Employer who acquires employees by any means, including as a result of a sale, contract, going out of business or as a result of becoming successful bidder or by performing work for the N.Y.C. Department of Education on a temporary basis shall be totally responsible for whatever benefits such employees are entitled to under the Labor Agreement including wages, wage accruals, Christmas and Easter Adjustment as provided in Section XV, vacations for shop employees, holidays, cleaning allowance and safety bonus, pension and welfare contributions for employees on disability and worker's compensation at the time such employees are acquired and any other contractual obligations which may be due to such employees.

Any pro-ration of benefits on the part of the previous Employer and the new Employer shall be a matter of discussion between those parties only and shall not

interfere with payment to the employees at the time such payments are due.

## SECTION VIII
## No Subcontracting

The Employer shall not sub-contract any of its work during the term of this Agreement if the employees and equipment are available and if the work can be performed pursuant to law.

## SECTION IX
## Military Service

The Employer agrees, to comply with all applicable laws regarding military leave.

## SECTION X
## Leaves of Absence

(a) It is agreed by the Employer that if any member of the Union shall be elected or appointed to any office or position within the Union which requires such member's absence from the service of the Employer for varying lengths of time, the Employer will grant leaves of absence without pay to such employees for such absences, until such term of office or position of responsibility expires or is terminated. The seniority and tenure of the employee shall not be affected by such leave of absence. It is understood that the leaves of absence referred to in this Section may be had only for Union business.

(b) Employees may be granted limited leaves of absence not to exceed sixty (60) days for personal reasons. The Employer may require two weeks notice. A written statement authorizing such leave of absence shall be furnished to the said employees upon written application to the Employer and a copy to the Union. An employee granted a leave of absence shall retain full seniority rights. No leave of absence shall be granted for the purpose of outside employment. Any member of the Union who, during such leave of absence accepts such outside employment shall be deemed by the Employer and the Union to have resigned from employment by the Employer, and, if reinstated, shall be deemed a new employee.

(c) The parties agree to abide by the provisions of the Federal Family and Medical Leave Act including its eligibility rules.

## SECTION XI
## Welfare Fund

(a) 1. Effective July 1, 2003, contributions shall be made for twelve (12) months of the year and shall be paid monthly July through June according to the following schedule for each employee covered by this Agreement. Contributions for July and August shall be based on the number of employees for whom contributions were owed for the month of June.

The Employer shall contribute to the Division 1181 A.T.U.-New York Welfare Fund the sum of $547.65 per month on a twelve (12) month

schedule or $636.65 per month on a ten (10) month schedule for the period commencing July 1, 2002 through February 28, 2003 for each employee covered by this Agreement.

The Employer shall contribute to the Division 1181 A.T.U.-New York Welfare Fund the sum of $567.65 per month on a twelve (12) month schedule or $656.65 per month on a ten (10) month schedule for the period commencing March 1, 2003 through June 30, 2003 for each employee covered by this Agreement.

The Employer shall contribute to the Division 1181 A.T.U.-New York Welfare Fund the sum of $567.65 per month on a twelve (12) month schedule for the period commencing July 1, 2003 through December 31, 2003 for each employee covered by this Agreement.

The Employer shall contribute to the Division 1181 A.T.U.-New York Welfare Fund the sum of $577.65 per month on a twelve (12) month schedule for the period commencing January 1, 2004 through December 31, 2004 for each employee covered by this Agreement.

The Employer shall contribute to the Division 1181 A.T.U.-New York Welfare Fund the sum of $587.65 per month on a twelve (12) month schedule for the period commencing January 1, 2005 through December 31, 2005 for each employee covered by this Agreement.

The Employer shall contribute to the Division 1181 A.T.U.-New York Welfare Fund the sum of

$607.65 per month on a twelve (12) mo[illegible] schedule for the period commencing January 1, 2006 through June 30, 2006 for each employee covered by this Agreement.

The Employer's obligation to contribute to the Welfare Fund for the twelve (12) months commencing July 1, 2002 through June 30. 2006 shall include any new runs and employees who may have been hired effective July 1, 2002 and each year of the contract. The Employer shall contribute the then effective rate for the balance of the term of the Agreement for each employee on the seniority list (all full-time and shape employees).

2. a) For Master List employees who were employed by any Employer under this Agreement (or a predecessor or successor agreement) for nin[illegible] days or more immediately preceding employm[illegible] with the Employer and the employee followed the work, the Employer shall contribute for the month in which they are first employed. Benefits for such employees shall commence immediately without any further waiting period.

b) For Master List employees who were employed by any Employer under this Agreement (or a predecessor or successor agreement) for less than ninety days immediately preceding employment with the Employer and the employee followed the work, the Employer shall contribute for the month in which such time with the previous employer combined with his or her time with the Employer

equals ninety (90) days. Benefits for such employees shall commence at that time.

c) 1) Contributions for all new employees (those employees who were not employed by any Employer under this Agreement (or a predecessor or successor agreement) shall be made for the month in which the employee completes ninety (90) days of employment and for each month thereafter. Benefits to such new employees shall commence the first of the month following the completion of such ninety (90) day period after initial employment.

2) For the purpose of this Section it is understood that contributions to the Welfare Fund shall be paid on behalf of all employees covered by this Agreement; provided, however, that contributions shall be made for casual employees after they become shape employees, provided the employee has been employed for ninety (90) day or more at the time he/she becomes a shape. Thereafter, such employees shall be considered part of the regular work force.

(b) The Employer shall contribute for employees on disability benefits under the Welfare Fund or no fault benefits, up to a maximum of one (1) year.

The Employer shall contribute for employees on Worker's Compensation, up to a maximum of one (1) year, effective November 1, 2003; except that for employees hired on or after November 1, 2003 who

go on worker's compensation during the period from ninety (90) days to six (6) months of employment, the Employer shall contribute to the Welfare Fund for the period of such leave, up to a maximum of twenty-six (26) weeks. For employees hired before November 1, 2003 and who go on Worker's Compensation before that date, the Employer shall contribute to the Welfare Fund for the period of such leave, up to a maximum of twenty-four months.

(c) Employees on a requested leave of absence for a period of one or more months shall pay to the Fund the full required contribution in order to be covered for Welfare Fund benefits and there shall be no proration of the monthly contribution, and the Employer shall have no obligation to contribute for such employees for the duration of the employee's leave. For any period of less than one full month, the Employer shall be responsible for the payment of the full contribution for the employee.

(d) 1. Contribution amounts described in this Agreement shall be received by the Funds by the twenty-fifth (25th) of the month following the month in which the work was performed ("Due Date"). Any payment due or notice required that falls on a weekend shall be due the next following work day. Interest at the rate of eighteen (18) percent per annum shall be paid for delinquent contributions from the date due, except as to contributions due as a result of an audit which shall be governed in accordance with paragraph (e) herein. In addition thereto, the reasonable cost of audit fees and attorney's fees and any amounts available under

law necessary to effect collection shall be paid by the Employer. Contributions and interest shall be considered contributions for the purposes of N.Y.C. Department of Education attachments. Moreover, the Fund will immediately request the Department of Education to attach the contractor's payments.

2. June contributions shall be paid weekly, with each payment equal to 1/4 of the monthly contribution rate per employee, within seven (7) days of the end of the payroll period. (An Employer that does not want to pay June contributions weekly may instead, by May 1st, post a bond or obtain a letter of credit acceptable to the Union or Fund securing the amount of contributions expected to be due for the month of June, based on the amount due for March.)

(e) 1. The Trustees shall have the authority to have a public accountant audit the payroll, wage records and any other records of the Employer as the Trustees deem necessary for the purpose of determining the accuracy of contributions to the Welfare Fund, including the billings to the N.Y.C. Department of Education for the period that is being audited.

2. Delinquent contributions owed as a result of an audit shall be charged interest at a rate of twelve percent (12%) per annum if such amounts are paid within thirty (30) days from the date the audit is provided to the Employer. If such amounts are not paid within thirty days from the date the audit is provided to the Employer, delinquent contributions

owed as a result of an audit shall be charged interest at a rate of eighteen percent (18%) per annum from the original due date to the date of payment. The Employer shall have four weeks after the date of the notice of the payroll audit findings to submit a written dispute to the audit findings, which must identify and explain all disagreements with the audit procedures, reports or conclusions. Notwithstanding submission of a timely written dispute, the Employer must still pay all undisputed amounts (including interest and audit fees) within thirty days or will be liable for interest at a rate of eighteen percent (18%) per annum from the original due date to the date of payment. Similarly, if the disputed audit reports are affirmed the Employer shall pay interest at a rate of eighteen percent (18%) per annum from the original due date to the date of such unpaid amounts.

3. The Board of Trustees' determination that contributions are owed constitutes the required finding for purposes of N.Y.C. Department of Education attachments for welfare contributions owed as a result of a payroll audit. The Union or Fund shall provide two (2) weeks' notice of a delinquency in contributions as a result of a payroll audit, and shall not attach under such circumstances until another two (2) weeks has passed to allow for discussion of the proposed attachment and attempts at resolving any disagreements.

(f) 1. The Employer shall assume the obligation[s] predecessors to the N.Y.C. Department Education, including contributions to the Fu[nd] This includes successors as described below party owed a payment under the Agreement r[...] collect from either the predecessor or succes[sor] as described above.

2. A company that, by any means, assumes acquires a N.Y.C. Department of Educat[ion] contract shall be responsible for all outstand[ing] obligations due at the time of the assumption acquisition. If either party to the transaction wa[...] an estimate of any amounts due to the funds Union, they must request such an estimate [...] permit an audit no less than twenty (20) d[ays] before the transaction. Such audit shall [be] completed and a report issued within a reasona[ble] period of time, but no longer than six (6) mon[ths] provided the Employer must make the reco[rds] readily available and must reasonably cooper[ate] with the Fund's auditor.

(g) The Trustees of the aforesaid Welfare Fund shall, w[...] the funds available, grant such benefits as the Trust[ees] deem prudent and advisable.

(h) The Employer is bound to the terms of the Fun[d] Agreement of Trust and policies and procedu[res] adopted by the Trustees.

(i) If an Employer breaches the Agreement, it is lia[ble] for the contributions that would have been made [had] the Employer not breached the Agreement.

(j) 1. Notwithstanding paragraph (a), the reserve funds in the Welfare Fund shall be maintained at a minimum of four (4) months and a maximum of eight (8) months. If the reserve falls below four (4) months, the Employer agrees to contribute an additional amount to the Welfare Fund to achieve such four (4) months reserve. If the reserve reaches eight (8) months, the Employer shall receive a credit against future contributions so long as the reserve remains at or above eight (8) months. The total amount of an outstanding contribution ("Amount Due") shall be included in the calculation of Liquid Assets if it may be attached at the N.Y.C. Board of Education. If however, the Department of Education does not remit the attached money to the Fund by the (27th) of the month following the Due Date, the Amount Due shall thereafter be excluded from Liquid Assets until actually received by the Fund. Interest on the Amount Due shall be included in Liquid Assets when received by the Fund.

2. The parties, by separate agreement, shall agree upon a method of calculation. The Fund Actuary's determination that contributions are owed constitutes the required finding for purposes of N.Y.C. Department of Education attachments of monthly contributions, provided however that a determination by the Board of Trustees is required to trigger an attachment for a delinquency resulting from a payroll audit.

ine all or all age the ich mit ew yer me ck be the ay yer e it ted yer of uch rity